**MERCY HEALTH SERVICES, Plaintiff,**

v.

**1199 HEALTH AND HUMAN SERVICE EMPLOYEES UNION, Defendant.**

No. 1:95–CV–39.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 23, 1995.

Jacqueline D. Scott, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for plaintiff Mercy Health Services, a Michigan Non–Profit Corp.

Ellen F. Moss, Klimist, McKnight, Sale, McClow, & Canzano, Southfield, MI, for defendant Local 1199 National Health and Human Service Employees Union.

## OPINION

QUIST, District Judge.

Plaintiff, Mercy Health Services, brought this action against defendant 1199 Health and Human Service Employees Union alleging defamation, tortious interference with business expectancy and violation of the Lanham Act 15 U.S.C. § 1125(a). Plaintiff seeks monetary damages and injunctive relief.

The claims arise out of two radio commercials and one television commercial which the defendant caused to be broadcast in January 1995. The broadcast of these three specific commercials or "substantially similar" commercials has been enjoined pursuant to two temporary restraining orders entered by Hon. David W. McKeague[1] on January 27 and January 31, 1995.

This matter is now before the Court on plaintiff's motions for preliminary injunction to prohibit the dissemination of these three commercials and substantially similar commercials. This Court has reviewed the affidavits, documentary evidence, pleadings and briefs of the parties. It has also heard oral arguments from the parties' attorneys and testimony from several witnesses at a hearing conducted on February 14, 1995. This Opinion constitutes this Court's findings of fact and conclusions of law.

## FACTS

Plaintiff, Mercy Health Services, is a Michigan non-profit corporation. Mercy Health Services is the sole member of Sisters of Mercy Health Corporation. Mercy Health Services and Sisters of Mercy Health Corporation are sponsored by a Roman Catholic religious order called the Detroit Regional Community of the Religious Sisters of Mercy. Mercy Health Services owns several acute care hospitals located in Michigan and Iowa, including Saint Mary's Health Services in Grand Rapids, Michigan, Muskegon Mercy Community Healthcare Services in Muskegon, Michigan, Saint Lawrence Hospital in Lansing, Michigan, Mercy Hospital in Cadillac, Michigan, Catherine McAuley Hospital in Ann Arbor, Michigan, and Saint Joseph Mercy Hospital in Pontiac, Michigan. Mercy Health Services also provides management and consulting services to about fifteen other hospitals, including Mercy Community Hospital in Port Jervis, New York (MCH).

Defendant, Local 1199 of New York, is an unincorporated trade union in New York, New York, which represents approximately

---

1. Because I was not available when the motion for a temporary restraining order was filed, the motion was referred to the Hon. David W. McKeague for adjudication pursuant to W.D.Mich.L.R. 27(e). Judge McKeague held a hearing on January 26, 1995.

100,000 members in the State of New York. Among the registered nurses that the defendant represents are the registered nurses who are or were employed by MCH. MCH is owned by the New York Regional Council of the Religious Sisters of Mercy, which is also "sponsored" by the Religious Sisters of Mercy. There is no evidence that the defendant has any members in the State of Michigan.

Defendant is currently involved in a labor dispute with MCH in Port Jervis, New York. The organized registered nurses of MCH have been on strike since September 1994. However, there is no labor dispute between Mercy Health Services and any union representing Mercy Health Services' employees in Michigan or Iowa. The registered nurses of St. Mary's Hospital in Grand Rapids are not represented by a union. The nurses of Muskegon Mercy Hospital are working under an existing contract and they are currently negotiating a new contract. Although the unionized hospitals have had disputes with their bargaining unit employees from time to time, these disputes have been generally handled within the context of the collective bargaining agreements. There has been no walkout or lockout of registered nurses in any Michigan or Iowa hospital owned and operated by Mercy Health Services.

On or about January 13, 1995, defendant began broadcasting commercials on several radio stations in Kent and Muskegon Counties, Michigan. The transcripts of the radio commercials are attached to the Preliminary Injunction as Exhibits A and B. Plaintiff claims that the radio commercials are false, malicious, and defamatory. Plaintiff cites the following excerpts from the commercials as examples of statements which were knowingly made with reckless disregard of the truth:

a. Mercy Health Services has a history of bringing in inexperienced nurses to replace trained, highly skilled nurses on the job.

b. Mercy Health Services' history of problems could affect the quality of care you receive.

c. Mercy's wasted money at many hospitals on conflicts with their nurses and other health care workers. Money it could have spent on better care.

d. In one recent case, Mercy Health Services caused over 80% of the nurses in its operating room to walk out. It replaced the highly-skilled, experienced local nurses with inexperienced people.

Mercy Health Services claims that these statements intentionally mislead consumers into believing that there is a labor dispute in Michigan which adversely affects the quality of health care provided by Mercy Health Services in Michigan. Mercy Health Services explains that defendant is engaged in a labor dispute with MCH in New York and not with any facility in Michigan.

Following a hearing on January 26, 1995, the Honorable David W. McKeague issued a Temporary Restraining Order prohibiting the defendant from broadcasting radio commercials which were the same as or substantially similar to those which had been broadcast. On January 30, 1995, Judge McKeague denied defendant's Motion for a Stay Pending Appeal.

Shortly after the Temporary Restraining Order was issued, defendant published a new commercial which was broadcast on cable television in Ann Arbor and Detroit. The television commercial depicts a woman lying in a hospital bed. There is no nurse present in the hospital room. The caption states, "A message from Nurses for Quality Health Care 1199 League of Registered Voters."[2] A talk-over voice says:

When some member of your family is in the hospital, you want to be sure that whenever they need help or comfort there are enough experienced registered nurses available to answer their calls. Mercy Health Services, which operates hospitals and HMOs in Michigan and around the

2. At the hearing on February 14, 1995, defendant's counsel stated that the term "1199 League of Registered Voters" was a typographical error and should read "1199 League of Registered Nurses."

country, has wasted money on conflicts with their nurses and other health care workers, and that's no place for your loved ones. Because the people we love are too important to keep waiting.

The commercial concludes with the woman pushing the nurse call button—no one responds during the commercial.

On January 31, 1995, plaintiff filed a Motion for Second Temporary Restraining Order and Order to Show Cause. Plaintiff alleged that the newly released commercial was misleading, defamatory and was causing irreparable harm to Mercy Health Services. On January 31, 1995, Judge McKeague issued a Second Temporary Restraining Order prohibiting defendant from disseminating commercials which are substantially similar to those identified in the two temporary restraining orders. On February 2, 1995, Judge McKeague denied defendant's Second Motion For Stay Pending Appeal. In an

Order filed February 10, 1995, the Sixth Circuit denied the defendant's emergency Motion for a Stay Pending Appeal and advised this Court to proceed with the preliminary injunction hearing. The hearing was held on February 14, 1995. After the hearing, this Court extended Judge McKeague's orders to 5:00 PM, February 24, 1995, in order to give the Court adequate time to study the materials submitted at the hearing.

### The Parties And Their Interrelationship

Mercy Health Services and MCH are governed by separate and distinct religious organizations even though the two entities are both sponsored by the Religious Sisters of Mercy. Mercy Health Services and MCH are separate corporations with separate boards of directors. However, there is substantial cooperation between the two organizations as evidenced, in part, by the Management and Affiliation Agreement dated June 6, 1994.[3] This Management and Affiliation

---

3. The management agreement provides, among other things:

I. *Purpose and Necessity for Agreement*
SMHC will provide management, affiliation and consulting services to MCH through its Iowa Regional Office.

\* \* \* \* \* \*

III. *Relationship of the Organizations*
[T]he Governing Bodies of the respective parties are not the same. MCH, SMHC, and MHS are governed by separate boards, which establish policy for each respectively; however, it is significant that the sponsorship, values and traditions are the same—those of the Religious Sisters of Mercy.

MCH and SMHC shall remain, at all times, independent organizations whose respective Members and Board, remain responsible for establishing corporate policy. In addition, the Members and Board of each shall remain responsible for the conduct of the business and affairs of their own organization, consistent with this Agreement. Nothing contained in this agreement is intended by either party to alter, weaken, displace or modify the authority and responsibility of the Board of MCH, SMHC, or MHS. Powers not specifically provided SMHC or the Chief Executive Officer in the Agreement shall remain with the Board of MCH. The Board of MCH shall continue to exercise full control over its assets and does not, by virtue of this Agreement, delegate to SMHC any of the powers, duties and responsibilities vested in MCH by law....

Neither party, nor MHS, by virtue of this Agreement, assumes any of the debts, obligations or liabilities of MCH, SMHC or MHS.

\* \* \* \* \* \*

V. *Personnel*
A. Under the previous Management Agreement, SMHC referred to MCH a field of qualified hospital administrator candidates, suited for the role of Chief Executive Officer ... in accordance with the perceived needs of MCH. The CEO was selected by MCH in accordance with its bylaws from the field of candidates provided by SMHC. A CEO selected by MCH is currently serving as CEO at MCH under the previous Management Agreement. SMHC will continue to provide to MCH the services of the CEO who is serving at MCH on the date of commencement of the term of this Agreement.

\* \* \* \* \* \*

C. Under the terms of this Agreement, the CEO will be a full-time administrator, who will provide the management services and perform the duties set forth in the CEO job description which has been structured in accordance with the needs of MCH, and in conformity with its Certificate of Incorporation, bylaws, rules and regulations and in conformity with Title 10, Section 405.3(f) of the Codes, Rules and Regulations of the State of New York.

D. The CEO provided by SMHC shall be an employee of SMHC at all times....

\* \* \* \* \* \*

VI. *Corporate Services and Benefits Provided by SMHC to MCH*
SMHC shall provide upon the request of MCH, general (minor) consultative management services by providing access to various corporate services through the Iowa Regional Office:

Agreement is for three years, but either party can terminate the Agreement by giving 90 days notice.

In 1983, Mercy Health Services guaranteed the repayment of a $24,985,000 mortgage note of MCH to the New York State Medical Care Facility Finance Agency in connection with MCH's building program. Mercy Health Services has also given MCH a revolving line of credit pursuant to an agreement. The Official Statement describing the mortgage note and the guaranty of Mercy Health Services specifically states: "The Guaranty Agreement is not contingent upon the continuance of the existing or any future management agreement between the Hospital (MCH) and the Corporation (Mercy Health Services)." p. 10. The Official Statement also provides:

> In addition, the Hospital and the Corporation will enter into an affiliation agreement prior to the delivery of the 1983 Series A Bonds. This agreement will provide that the Hospital and the Corporation will remain independent organizations whose members and boards will be responsible for establishing their respective corporate policies. The Hospital will agree, for a fee, to utilize certain of the Corporation's corporate services and benefits. The Guaranty Agreement is not contingent upon the creation or continuance of such affiliation agreement.

*Id.*

Mr. Howard G. Estock [4] is the chief negotiator for MCH in its collective bargaining with the defendant. He reports directly to a negotiation oversight committee comprised of eight members of MCH's board of directors. Six of the eight members of the oversight committee are lay individuals unaffiliated

A. Ministerial Development
B. Finance
C. Quality Assurance
D. Planning
E. Human Resources
F. Insurance
G. Legal
H. Purchasing (access to Mercy National Publishing, Inc.)

\* \* \* \* \* \*

**VII. *Independent Contractor Status***
SMHC shall act as an independent contractor in the performance of this Agreement, and all of the employees or independent contractors of SMHC performing services pursuant to this Agreement, will remain on the payroll of SMHC.

\* \* \* \* \* \*

**IX. *Fee Payable to SMHC for Corporate Services***
  **A. *Basic Corporate Services***
  MCH shall pay to SMHC an annual fee for the Basic Corporate Services determined in advance by SMHC in accordance with the procedure set forth below....
  The annual fee payable by MCH shall be $25,-000....
  **B. *Optional Corporate Services***
  Optional Corporate Services requested from time to time by MCH shall be provided to MCH at SMHC cost. MCH shall be notified in advance of the rates for such charges and may choose not to request such services. Payment shall be made in a manner and at a time agreed upon by the parties.
**X. *Governance Structure of MCH***
  Governance of MCH shall remain the responsibility of the Board of MCH. However, an individual selected by SMHC, either the President of SMHC or some other person, shall be a member of the Board, Executive Committee and Finance Committee and shall participate in discussions at such meetings. The SMHC representative shall not have a vote either on the Board, Executive Committee or Finance Committee.

\* \* \* \* \* \*

**XV. *Discharge of SMHC***
  The Board of MCH retains the authority to discharge SMHC or any of its employees or agents, including without limitation, the CEO or any independent contractor, from their position at MCH upon notification to and consultation with the Commissioner of Health.

\* \* \* \* \* \*

**XVII. *Nonexclusivity***
  MCH may enter into agreements with others to receive services similar to those provided by SMHC hereunder (which shall not result in the reduction of the fee payable by MCH to SMHC hereunder). In addition, SMHC may enter into similar management or affiliation agreements with third parties.

\* \* \* \* \* \*

**XX. *Identification***
  Each party will be permitted to use the other's name, but solely in the context of identifying the relationship between the parties as one of affiliation. Neither party is designated as the agent of the other for any purpose by virtue of this Agreement.

\* \* \* \* \* \*

**XXV. *Construction***
  ... SMHC is not intending through this arrangement relationship to exert ownership or control over the operations of MCH.

4. Mr. Estock is a lawyer in private practice.

with Mercy Health Services or the Sisters of Mercy. One member of the oversight committee is a member of the Sisters of Mercy in Westchester County, New York. Another member of the oversight committee is Mr. Thomas J. Moakler, the President and Chief Executive Officer (CEO) of MCH. The oversight committee reports directly to MCH's board of directors.

Mr. Moakler is the president and CEO of MCH *and* an executive vice president of Mercy Health Services. He was engaged pursuant to the procedure set forth in the Management and Affiliation Agreement whereby Mercy Health Services recommended a field of candidates suited for the role of CEO for MCH. MCH had the right to reject any CEO recommended by Mercy Health Services, but there is no information that it did so in this case. The terms and conditions of Mr. Moakler's employment are set forth in writing. Mr. Moakler's employment agreement is with Mercy Health Services and not with MCH. Mr. Moakler's employment agreement is for a five year term, but the agreement may be terminated. If Mr. Moakler's employment is terminated during the term, he will be paid his salary for 12 months. Mr. Moakler's engagement letter from Mercy Health Services says, in part:

**5. PRINCIPAL ACCOUNTABILITIES**

1. Knows, understands, incorporates and demonstrates the MHS Philosophy, Mission, Vision and Values in leadership behaviors, practices and decisions.

   \*    \*    \*    \*    \*    \*

3. Formulates the mission and strategic plans of the CHCS [referring to MCH], develops and achieves it's [sic] goals and objectives. . . .
4. Plans, directs, controls and evaluates all CHCS activities to ensure organizational efficiency and effectiveness in the achievement of goals and objectives.
5. Provides leadership in the governance of the CHCS by serving as a board member to ensure successful governance-management interface.

   \*    \*    \*    \*    \*    \*

7. Ensures the development of systems, practices and policies that embody human dignity, protect human rights and promote human development to actualize the values expressed in the MHS Vision Statement and the Philosophy of the Sisters of Mercy Health Corporation.

All on the management team are pleased with your appointment, and we look forward to working with you. We plan to provide the full support and backing of Mercy Health Services and the Sisters of Mercy Health Corporation in the achievement of the important mission and goals of Mercy Community Hospital.

Mr. Moakler's "Position Description" states that Mr. Moakler reports to "Executive Vice President Central Michigan Region and Local Community Health Care System Board." In other words, Mr. Moakler has joint reporting responsibilities to Mercy Health Services and MCH. The following describes Mr. Moakler's "Position Purpose":

Provides the executive leadership to Mercy Community Hospital necessary to assure the continuance of quality patient care, fiscal stability, maintenance of the physical plant, and the enhancement of the Community Health Care Systems (CHCS) public and professional image and to ensure the achievement of organizational goals and objectives consistent with the philosophy and mission of Mercy Health Services (MHS).

Mr. Moakler's responsibilities as set forth in the "Principal Accountabilities" are far-reaching.[5]

8. Contributes to the overall success of MHS by providing input, participating in senior management assemblies, supporting corporate directions, and promoting unity of purpose.
9. Ensures an effective participative management climate and the attainment of CHCS goals and objectives through the selection, direction, and development of the key management staff.

   \*    \*    \*    \*    \*    \*

13. Maximizes operating and financial performance through effective expense management, enhanced productivity, increased market share, and expanded philanthropic support.

   \*    \*    \*    \*    \*    \*

WORKING RELATIONSHIPS
The incumbent meets regularly with the administrative group for the purpose of communication, coordination, policy review, operational planning and budget development. The CEO meets with the Vice President of Finance regarding the overall performance of the CHCS and financial strategies. The CEO also relates directly with the medical staff on significant issues, particularly with respect to liability or credentialing.
Corporately, the incumbent is a member of the Mercy Health Advisory Council which consists of

*Defendant's Research Into Relationship Between Plaintiff and MCH*

Prior to running the radio and television commercials, defendant researched the relationship between plaintiff and MCH. Defendant's research was conducted by Ms. Alison Laevey, an independent labor research assistant. Ms. Laevey's research revealed that MCH was operated and managed by Mercy Health Services. Ms. Laevey testified at the February 14 hearing and stated her belief that MCH was part of a larger system. She discovered that Sisters of Mercy Health Corporation guaranteed almost $25 million worth of revenue bonds for MCH's expansion and renovation program. An Independent Auditor's Report showed that MCH was charged an annual loan guaranty fee of 1.0% of the average outstanding principal balance. MCH also had an agreement to utilize a line of credit from Sisters of Mercy up to an amount of $3,989,000 for working capital requirements. Her research also showed that the CEO of MCH was an employee of Sisters of Mercy Health Corporation and that a MCH board member was associated with Sisters of Mercy in Michigan. Defendant argues that these facts demonstrate that plaintiff was in a position to control MCH. It also argues that this shows lack of malice.

*This Court's Findings Regarding The Relationship Between The Parties*

This Court believes that Mr. Moakler is the single most influential person in the governance and management of MCH, including the negotiation oversight committee. Although Mr. Moakler constitutes only 12½% of the negotiation oversight committee, he would certainly have the most influence on the committee because he is the full-time CEO of MCH and was recommended by Mercy Health Services because of his expertise.[6] However, the Management and Affiliation Agreement does maintain the independence of MCH. For example, MCH can terminate the Management and Affiliation Agreement upon 90 days notice. MCH can terminate Mr. Moakler after consultation

with state authorities. In addition, corporate control, absent evidence to the contrary, is determined by who is on the board of directors or board of trustees or, in the case of for-profit corporations, who can elect a majority of a board of directors or trustees. In this particular case, the board of MCH is not dominated or controlled by people selected by Mercy Health Services. MCH's board has the ultimate authority and responsibility to direct Mr. Moakler.

In tentatively finding that MCH is not controlled by Mercy Health Services, this Court is not relying upon a "mere technicality" as could exist in the situation of parent and subsidiary corporations. Rather, it appears to the Court at this time that Mercy Health Services and MCH are completely independent organizations. MCH's board of directors, not Mercy Health Services, has the legal *responsibility* for directing the labor negotiations of MCH. Mr. Moakler has the legal responsibility to follow the directions of MCH's board. Also, as a practical matter, it is MCH's board that is in the Port Jervis, New York, community, and MCH is the entity seeking to satisfy the needs of the community. This Court agrees that Mercy Health Services has a strong financial incentive to do what it can to make sure that MCH is financially successful. However, this strong financial incentive is no different from what any guarantor or lender would have in an ordinary commercial loan. The mere existence of an incentive created by a guarantee does not constitute control over management, including labor relations.

This finding does not foreclose defendant from proving the dependence of MCH or from showing that Mercy Health Services has the ultimate authority and responsibility for directing MCH's employment relations. For example, the regulations of the New York State Commissioner of Health (which this Court has been unable to locate) might bear on this issue as might articles of incorporation, bylaws, minutes, etc.

---

all the CEOs within the Sisters of Mercy Health Corporation. The group is advisory to the Corporation and addresses critical corporate issues such as capital formation, corporate restructure,

policy questions, corporate office budgetary requirements and other major areas of concern.

6. Mr. Moakler's duties include making important recommendations to MCH.

### Standards For Preliminary Injunction

■ A motion for preliminary injunction asks the Court, at an early stage in the proceedings, to determine whether equitable relief is warranted to preserve the status quo pending adjudication of plaintiff's claims on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Corbin v. Texaco, Inc.,* 690 F.2d 104, 105 (6th Cir.1982).

■ The four factors to be balanced when determining whether a preliminary injunction is proper are:

1. the likelihood of plaintiff's success on the merits;

2. whether the injunction will save the plaintiff from irreparable injury;

3. whether the injunction would harm others; and

4. whether the public interest would be served by the injunction.

*In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). These factors are to be balanced, not prerequisites which must be met. *Id.* at 1229; *Keweenaw Bay Indian Community v. State,* 11 F.3d 1341, 1348 (6th Cir.1993). In general, the probability of success on the merits that must be shown is inversely proportional to the degree of irreparable injury plaintiff will suffer absent an injunction. *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir.1987). However, "the demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless." *Id.* "Ordinarily the party seeking a stay must show a strong or substantial likelihood of success. However, at a minimum the movant must show 'serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if a [stay] is issued.'" *Id.* (citations omitted). Fed. R.Civ.P. 52 requires a district court to make specific findings regarding each of these factors unless fewer are dispositive.

### Likelihood of Success on the Merits

Mercy Health Services' basic argument is that the commercials sponsored by defendant are intentionally misleading because they fail to disclose that the labor dispute is not in Michigan. In response, defendant argues, among other things, that plaintiff's claims are preempted by federal labor law. Defendant cites *San Diego Bldg. Trades Council v. Garmon,* 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957), for the proposition that plaintiff's claims are within the exclusive jurisdiction of the National Labor Relations Board (NLRB). Defendant argues that when plaintiff filed a charge with the NLRB it conceded that its state law claim was inappropriate and preempted.

In *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), the Court dealt with preemption under the National Labor Relations Act. The Court concluded that the States do not have to yield jurisdiction "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act ... [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 243–244, 79 S.Ct. at 779. In *Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), the Court held that malicious libel fits within the exception carved out by *Garmon* and therefore is not barred by the National Labor Relations Act:

> We conclude that where either party to a labor dispute circulates false and defamatory statements during a union organizing campaign, the court does have jurisdiction to apply state remedies if the complainant pleads and proves that the statements were made with malice and injured him.

*Id.* at 55, 86 S.Ct. at 659.

In this Court's judgment, the commercials are defamatory because they attempt to frighten Michigan residents into believing that Mercy Health Services' hospitals in Michigan cannot deliver adequate care and comfort because they are not adequately staffed with trained, experienced nurses available to answer patients' calls. Instead of identifying the labor dispute which currently exists in New York, the commercials

imply that a Michigan hospital operated by Mercy Health Services has experienced a walkout of experienced nurses or is using inexperienced nurses. In so doing, defendant crosses the line from aggressive information dissemination to malicious defamation.

It is important to recognize that the commercials are directed to an audience of people who are particularly vulnerable and fearful because of their need for medical care. The commercials prey upon this vulnerability:

a. All of the commercials were broadcast in Michigan and were thus directed at Michigan residents.

b. The first sentence of the television broadcast refers to "you." The next sentence says, "*that's* no place for *your* loved ones." The words within the context of the visual depiction of the television commercial deliver the message that a Mercy Health Services' hospital in Michigan is no place for a loved one because there are not enough experienced registered nurses available to answer your loved one's calls for assistance. The television picture shows a person in a hospital bed trying to reach the nurse call button, but no one responds—thereby visually reinforcing the verbal message of inadequate staffing in Michigan. There is no evidence of inadequate staffing in Michigan.

c. The radio commercial attached to the Preliminary Injunction as Exhibit A states, "In one recent case, Mercy Health Services caused over 80% of the nurses in *its* operating room, intensive care and emergency room to walk out." (Emphasis added.) The ordinary and natural conclusion to be drawn from this commercial which was broadcast in Michigan, a conclusion which this Court finds is intended by defendant, is that 80% of the described nurses in a Mercy Health Services' hospital in Michigan—i.e., St. Mary's hospital—walked out. This is a false message.

d. The radio commercial attached to the Preliminary Injunction as Exhibit B says, "[T]hey have Mercy Health Services in the

hospitals *here* [meaning Michigan]. Quite a few problems. Mercy has got a history of bringing in inexperienced nurses to replace trained highly skilled nurses on the job." (Emphasis added.) Once again, an audience in Grand Rapids, Muskegon, or elsewhere in Michigan would believe that inexperienced nurses were brought in to St. Mary's Hospital, Muskegon Mercy, or another Michigan hospital. This is not true either.

The defendant argues that each individual phrase in its commercials is correct. Although each individual phrase may arguably be accurate [7], when taken as a whole the commercials convey the false message described in the previous paragraph. *See Royal Palace Homes, Inc. v. Channel 7 of Detroit,* 197 Mich.App. 48, 52, 495 N.W.2d 392, 396 (1992). In truth, there is no labor dispute in Michigan that prevents patients in Mercy Health Services' hospitals located in Michigan from receiving experienced nursing care. There has been no walkout or lockout in any Michigan hospital. The evidence in this case supports the plaintiff's position that the commercials are false and misleading.

Furthermore, the Court finds that the defendant acted maliciously as that term is used by *Linn.* In *Linn,* the Court adopted by analogy the standards enunciated in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Construing the Act to permit recovery of damages in a state cause of action only for defamatory statements published with knowledge of their falsity or with reckless disregard of whether they were true or false guards against abuse of libel actions and unwarranted intrusion upon free discussion envisioned by the Act." *Linn,* 383 U.S. at 65, 86 S.Ct. at 664. When defendant caused the commercials to be published in Michigan it knew that there had been no walkout of registered nurses in Michigan; it knew that Mercy Health Services had not replaced "highly skilled experienced *nurses* with inexperienced *people*" (apparently not even nurses) in Michigan (Exhibit A); and it knew there was no short-

---

**7.** This Court believes that defendant's statements that Mercy Health Services has wasted money on conflicts with their nurses is a matter of fair comment and opinion. Mercy Health Services has had conflicts with some of its registered nurses. Whether money is "wasted" on such conflicts depends upon what side of the labor-management table one sits.

age of experienced nurses in Michigan. This advertising, especially in conjunction with clearly implied statements that a person would be uncaring if he or she placed a loved one in a Mercy Health Services hospital in Michigan, is malicious.

For these reasons, this Court concludes that the facts in this case fall within the *Garmon* exception to the National Labor Relations Act. Plaintiff is likely to succeed on its claim that the commercials are false and malicious in that they knowingly make defamatory representations regarding Mercy Health Services.[8]

Defendant also argues that the Union activity is protected by the Supreme Court's holding in *DeBartolo Corp. v. Florida Gulf Coast Building and Constr. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). This Court believes that *DeBartolo* is factually distinguishable and therefore not dispositive. In *DeBartolo* the Supreme Court upheld a union's right to engage in peaceful leafletting. The facts in *DeBartolo* do not involve allegations of defamation.

Defendant further contends that the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.,* prevents courts from entering injunctions in cases "involving or growing out of a labor dispute." Defendant insists there is no question that this case arises out of a labor dispute and therefore this Court lacks jurisdiction to issue an injunction. The Norris–LaGuardia Act provides:

> No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
>
> (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method *not involving fraud or violence.*

29 U.S.C. § 104 (emphasis added).

Mercy Health Services insists that the Act does not affect this case because it does not involve a labor dispute between the parties. The Act defines "labor dispute" in this manner:

> 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c). Mercy Health Services argues that it is not involved in a labor dispute with its employees. Mercy Health Services says that the labor dispute is between defendant and MCH.

As this Court found on pp. 834–835 of this Opinion, Mercy Health Services has persuaded the Court at this preliminary stage that it does not have control over the bargaining activities at MCH. It has also persuaded the Court that there is no "labor dispute" between Mercy Health Services and defendant.

Mercy Health Services also claims that it is entitled to injunctive relief under the Lanham Act. The Trademark Law Revision Act, 15 U.S.C. §§ 1051–1127 expanded the law of false advertising by amending Lanham Act section 43(a), 15 U.S.C. § 1125(a), to prohibit false or misleading advertising about another's goods, services or commercial activities. The Act reads in part:

> (a) The several courts vested with jurisdiction of civil actions arising under this Chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable to prevent a violation of section 1125(a) of this title....

15 U.S.C. § 1116(a).

\*    \*    \*    \*    \*    \*

> *Any person* who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol or device, or any combination thereof, or any ... false or misleading description of

---

8. Injury from the commercial is discussed on pp. 838–839, *infra.*

fact, or false or misleading representation of fact, which ...

> (B) in commercial advertising or promotion, misrepresents the *nature, characteristics, qualities* or geographic origin *of* his or her *or another person's* goods, *services, or commercial* activities, shall be liable in a civil action by any person who believes that he or she is likely to be damages by such act.

15 U.S.C. § 1125(a)(1) (emphasis added). Plaintiff claims that the Lanham Act affords relief against the defendant's false advertising.

This Court has not yet had time to determine the possible impact of the Lanham Act on this particular case. A literal reading of the statute seems to indicate that the Lanham Act could provide relief for plaintiff. At least one court has held that where there is a labor dispute within the meaning of the Norris–LaGuardia Act, the federal courts cannot enter an injunction under the Lanham Act. *Brach Van Houten Holding, Inc. v. Save Brach's Coalition,* 856 F.Supp. 472 (N.D.Ill. 1994). In any event, because of the previous findings and conclusions of the Court, a detailed analysis of the impact of the Lanham Act is not necessary for this Opinion.

Defendant asserts that this Court should not interfere with its rights to Free Speech guaranteed by the Constitution. Defendant does not believe that its speech is defamatory. "It is hard to fathom how possible confusion between Mercy Health Services and Mercy Community Hospital can be defamatory." Brief at p. 5. This is sophistry. Misrepresentations as to the location of a walkout or the hospital encumbered by a shortage of experienced registered nurses can be defamatory. In order to receive First Amendment protection, commercial speech must concern lawful activity and cannot be defamatory. E.g., *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980); *R.A.V. v. City of St. Paul,* 505 U.S. 377, 383–84, 112 S.Ct. 2538, 2543, 120 L.Ed.2d 305 (1992).

In summary, I find that the plaintiff has shown a substantial likelihood of success on the merits.

### *Irreparable Injury To Plaintiff*

■ In evaluating the harm that may occur in the event that the Court does not grant an injunction, the Court must consider three factors:

1. the substantiality of the injury alleged,

2. the likelihood of its occurrence, and

3. the adequacy of the proof provided.

*Ohio ex rel. Celebrezze,* 812 F.2d at 290 (citation omitted).

The affidavit and testimony of Ms. Michaelyn Benz indicate that she and her staff at St. Mary's hospital in Grand Rapids have received over 289 inquiries concerning the commercials. The affidavit of Ms. Judith Lonnee states that Muskegon Mercy has had over 200 documented inquiries regarding the commercials. Ms. Nancy Hart testified that these commercials have impugned the integrity of St. Mary's Hospital. This Court finds that the plaintiff will suffer irreparable harm if an injunction is not issued. The reputations of Mercy Health Services' individual Michigan hospitals are at stake. The reputation of a hospital is difficult to restore once it has been tainted. *See, Basicomputer Corp. v. Scott,* 973 F.2d 507, 510–11 (6th Cir.1992).

### *Harm To Defendant*

This Court believes that the injury to the defendant resulting from the injunction is slight. The preliminary injunction will apply only to representations as to nurse walkouts and lack of experienced nurses in the State of Michigan. The cost of producing the three commercials described in this Opinion has already been incurred. There is no additional cost incurred by defendant if further broadcast of these and substantially similar commercials is barred. This Court does not minimize the importance of the defendant's First Amendment right to freedom of expression. However, the defendant remains free to exercise its First Amendment right by publishing its position with alternative commercials. At the hearing on February 14, 1995, defendant's counsel stated that she could not distinguish the challenged commercials from other advertisements which have been published but the plaintiff is not challenging. Therefore, defendant is not pre-

vented from conveying its message to the public. It is simply being enjoined from publishing defamatory and malicious commercials.

*Public Interest*

This Court believes that the public interest would be served by an injunction. An injunction is warranted to prevent Michigan residents from becoming unnecessarily apprehensive about their health care as a result of commercials designed to mislead them into believing that the nurses caring for them and their loved ones are inexperienced or that these nurses might walk out. The Court agrees with defendant's advertising which acknowledges that a person in a hospital needs "help and comfort." Comfort for these patients is more likely to be achieved if these commercials are not broadcast. A person waiting to go into an operating room need not fear that the nurses in that operating room walked out at some prior time.

*Balancing*

This Court does not believe that Mercy Health Services' ultimate victory in this case is certain. What is clear, however, is that Mercy Health Services will suffer substantial irreparable damage if a preliminary injunction does not issue. The described commercials portray a labor dispute in Michigan which has resulted in experienced nurses not being available in Mercy Health Services' hospitals in Michigan. No such labor disputes exist; experienced nurses are available in Mercy Health Services' hospitals in Michigan; experienced nurses have not walked out of Michigan hospitals.

■ Therefore, using the balancing test set forth in *Nuclear Regulatory Comm'n*, 812 F.2d at 290, this Court believes that a preliminary injunction should be entered.

## CONCLUSION

For the reasons set forth above, the plaintiff's Motions for a preliminary injunction (docket nos. 5 and 23) are **GRANTED IN PART.**

Accordingly, **IT IS HEREBY ORDERED** that defendant, 1199 Health and Human Service Employees Union, its officers, agents, employees, attorneys and all those acting in concert with them who receive actual notice of this order by personal service or otherwise, are **RESTRAINED** and **SHALL CEASE AND DESIST** from distributing, transmitting, publishing, broadcasting or otherwise disseminating by any medium, commercials which have been identified and attached to the Preliminary Injunction as Exhibits A, B, and C and/or other advertisements which state or clearly imply: (1) that a Mercy Health Services' hospital in the State of Michigan does not have experienced nurses or might not have experienced nurses in the foreseeable future; and/or (2) that a Mercy Health Services' hospital in the State of Michigan experienced a walkout, lockout or strike of its nurses. This Order will be effective immediately.

## *PRELIMINARY INJUNCTION*

Based upon the findings of fact and conclusions of law set forth in the Opinion dated February 23, 1995,

**IT IS ORDERED** that plaintiff's Motions for a preliminary injunction (docket nos. 5 and 23) are **GRANTED IN PART.**

**IT IS HEREBY ORDERED** that defendant, 1199 Health and Human Service Employees Union, its officers, agents, employees, attorneys and all those acting in concert with them who receive actual notice of this order by personal service or otherwise, are **RESTRAINED** and **SHALL CEASE AND DESIST** from distributing, transmitting, publishing, broadcasting or otherwise disseminating by any medium, commercials which are attached to this injunction as Exhibits A, B, and C and/or other commercials which state or represent: (1) that a Mercy Health Services' hospital in the State of Michigan does not have experienced nurses or might not have experienced nurses in the foreseeable future; and/or (2) that a Mercy Health Services' hospital in the State of Michigan experienced a walkout or lockout or strike of its nurses. This Order will be effective immediately.

## EXHIBIT A

* SFX: SURGICAL VERBIAGE .. DOCTOR TO NURSE ... IN BACKGROUND

*AS A REGISTERED NURSE, I CAN TELL YOU ... YOU NEED THE FACTS ABOUT A HEALTH CARE SYSTEM AND THE HOSPITAL YOU GO TO BEFORE CHOOSING IT FOR YOUR FAMILY'S CARE. *TAKE MERCY HEALTH SERVICES, MERCY'S WASTED MONEY AT MANY HOSPITALS ON CONFLICTS WITH THEIR NURSES AND OTHER HEALTH CARE WORKERS. MONEY IT COULD'VE SPENT ON BETTER CARE. MONEY THAT YOU END UP PAYING FOR. *IN ONE RECENT CASE, MERCY HEALTH SERVICES CAUSED OVER 80% OF THE NURSES IN ITS OPERATING ROOM, INTENSIVE CARE AND EMERGENCY ROOM TO WALK OUT. IT REPLACED THE HIGHLY–SKILLED, EXPERIENCED LOCAL NURSES WITH INEXPERIENCED PEOPLE. DO YOU REALLY WANT TO BE PART OF A HEALTH CARE SYSTEM THAT DOES THAT? *IF YOU'RE PART OF HEALTH NETWORKS LIKE CARE CHOICES, BLUE CARE, OMNI CARE OR HEALTH ALLIANCE, YOU'VE GOT A CHOICE ... AND A RIGHT ... TO USE HOSPITALS OTHER THAN A MERCY HOSPITAL IN YOUR NETWORK. THIS MESSAGE BROUGHT TO YOU BY THE ELEVEN–NINETY–NINE LEAGUE OF REGISTERED NURSES, CONCERNED ABOUT YOUR FAMILY'S QUALITY CARE.

## EXHIBIT B

Hi, Jim, I am the new benefits manager. I have been working on the list of healthcare options for employees. They have Mercy Health Services in the hospitals here. Quite a few problems. Mercy has got a history of bringing in inexperienced nurses to replace trained highly skilled nurses on the job.

Mercy wasted money on conflicts with their nurses and other health workers when they could have gone for better care. Do you know who is paying for that. Ah! Ah! Our employees. Looks like the list just got opened up.

When you are choosing healthcare for you and your family, get the facts. Mercy Health Services history of problems could affect the quality of care you receive and your loved ones health is too important to risk that.

If you are a part of Health Network like Care Choices, Blue Care, Omni Care or Health Alliance you have a choice and a right to use hospitals other than Mercy hospitals in your network.

This message is brought to you by 1199 League of Nurses concerned about your family's quality of healthcare.

## EXHIBIT C

When some member of your family is in the hospital, you want to be sure that whenever they need help or comfort there are enough experienced registered nurses available to answer their calls. Mercy Health Services, which operates hospitals and HMOs in Michigan and around the country, has wasted money on conflicts with their nurses and other health care workers, and that's no place for your loved ones. Because the people we love are too important to keep waiting.