125 F.3d 1230
 156 L.R.R.M. (BNA) 2364, 97 Cal. Daily Op.
Serv. 7215,
97 Cal. Daily Op. Serv. 7408,
97 Daily Journal D.A.R. 11,982
 SAN ANTONIO COMMUNITY HOSPITAL, Plaintiff-Appellee,
v.
SOUTHERN CALIFORNIA DISTRICT COUNCIL OF CARPENTERS, an
unincorporated association; Carpenters Local
1506, an unincorporated association;
Does 1 through 100,
Defendants-Appellants.
 No. 96-56124.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 3, 1997.
Decided Sept. 8, 1997.
 
 Gerald V. Selvo and Daniel M. Shanley, DeCarlo, Connor & Selvo, Los Angeles, CA, for defendants-appellants.
 Douglas R. Hart and Teresa F. Elconin, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; Robert M. Takasugi, District Judge, Presiding. D.C. No. CV-96-04830-RMT.
 Before: FARRIS, KOZINSKI and T.G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 ORDER
 
 1
 The Opinion filed June 4, 1997, slip op. 6439, is hereby WITHDRAWN.
 
 OPINION
 
 2
 Southern California District Council of Carpenters ("the Union") appeals the district court's issuance of a preliminary injunction restricting the manner in which the Union had displayed a banner purporting to publicize its labor dispute with Best Interiors, a subcontractor engaged in a construction project at San Antonio Community Hospital ("the Hospital"). The district court concluded that the Hospital had met the strict requirements for a preliminary injunction set forth in the Norris-LaGuardia Act ("NLA"), 28 U.S.C. §§ 101-115. We have jurisdiction under 28 U.S.C. § 1292(a). We affirm.
 
 I. FACTS
 
 3
 The Union is currently engaged in an ongoing labor dispute with Best Interiors, a construction company, over Best Interiors' failure to pay its employees prevailing wages and benefits. Best Interiors is a subcontractor in an expansion project at the Hospital. There is no contract between Best Interiors and the Hospital. The Union concedes that it does not now have, and has never had, a labor dispute with the Hospital.
 
 
 4
 On June 21, 1996, the Union began displaying a banner near the Hospital's construction site and the entrance to the Hospital's maternity ward that was visible by passersby driving on San Bernardino Road in front of the Hospital and patients entering the maternity ward. The banner is displayed during the morning hours and is held by three retired members of the Union. In twelve-inch red capital letters on two lines, the banner reads: "THIS MEDICAL FACILITY IS FULL OF RATS." Below those lines, in five-inch red capital letters on two lines that appear just above the feet of the banner's holders, it reads: "CARPENTERS L.U. 1506 HAS A DISPUTE WITH [_______] FOR FAILING TO PAY PREVAILING WAGES TO ITS WORKERS." In the blank space, in two-inch black handwritten letters, the banner reads: "Best Int."[1]
 
 
 5
 On June 25, 1996, the Hospital filed unfair labor practice charges against the Union with the National Labor Relations Board ("NLRB"). During the NLRB investigation, there were several attempts to reach a negotiated agreement between the Union and the Hospital. After completing its investigation, the NLRB Regional Office determined that evidence could not support the Hospital's allegations, and the Hospital withdrew its charges.
 
 
 6
 On July 11, 1996, the Hospital filed this lawsuit in the district court, including various state tort claims and a federal claim for an unlawful secondary boycott under 29 U.S.C. § 187. On July 17, 1996, the Hospital filed a motion for a temporary restraining order which the district court denied on July 22, 1996, because the Hospital had failed to satisfy the requirements of the NLA.
 
 
 7
 On August 9, 1996, the district court held an evidentiary hearing on the Hospital's request for a preliminary injunction. After hearing the testimony of witnesses from both sides, the district court ruled that the Hospital had met the requirements for a preliminary injunction set forth in the NLA. The district court ordered that the Union's members "are hereby preliminarily enjoined from using the term, 'Rats,' as they currently have in their banner which they display in front of plaintiff San Antonio Community Hospital." This timely appeal followed.
 
 II. DISCUSSION
 
 8
 Generally, the grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. Does 1-5 v. Chandler, 83 F.3d 1150, 1152 (9th Cir.1996). See also Donnelly Garment Co. v. Dubinsky, 154 F.2d 38, 45 (8th Cir.1946) ("Since we conclude that the trial courts' findings against the appellants in this case on issues necessary to its power and jurisdiction to enjoin the appellees [under the NLA] are not clearly erroneous, the decree appealed from is affirmed."); International Ass'n of Bridge, Structural & Ornamental Iron Workers v. Pauly Jail Bldg. Co., 118 F.2d 615 (8th Cir.1941). However, when a case involves free expression, "[w]e must make an independent examination of the whole record so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974) (citations omitted). "While this duty has been most often recognized in the context of claims that the expression involved was entitled to First Amendment protection, the same obligation exists in cases involving speech claimed to be protected under federal labor laws." Id. We review issues of law underlying the district court's grant of a preliminary injunction de novo. Chandler, 83 F.3d at 1152.
 
 A. Injunctions and the Norris-LaGuardia Act
 
 9
 Under traditional legal standards, a moving party may become eligible to obtain a preliminary injunction by demonstrating "a combination of probable success on the merits and the possibility of irreparable injury." United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174 (9th Cir.1987). At the very least, "it must be shown as an irreducible minimum that there is a fair chance of success on the merits." Stanley v. University of S. Cal., 13 F.3d 1313, 1319 (9th Cir.1994).
 
 
 10
 The NLA is an anti-injunction statute that prevents district courts from issuing "any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this Act." 29 U.S.C. § 101. The NLA denies jurisdiction to district courts to issue preliminary injunctions that would prevent union members from "[g]iving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." 29 U.S.C. § 104(e) (emphasis added).
 
 
 11
 Therefore, in addition to satisfying the traditional requirements for a preliminary injunction and providing evidence of fraud or violence, the Hospital, as proponent of the preliminary injunction, was required to prove the following additional elements:
 
 
 12
 1) That unlawful acts have been threatened and will be committed unless restrained (29 U.S.C. § 107(a));
 
 
 13
 2) That substantial and irreparable injury to the Hospital's property will follow (29 U.S.C. § 107(b));[2]
 
 
 14
 3) That greater injury will be inflicted upon the Hospital by the denial of relief than will be inflicted upon the Union by the granting of relief (29 U.S.C. § 107(c));
 
 
 15
 4) That the Hospital has no adequate remedy at law (29 U.S.C. § 107(d));
 
 
 16
 5) That the public officers charged with the duty to protect the Hospital's property are unable or unwilling to furnish adequate protection (29 U.S.C. § 107(e)); and
 
 
 17
 6) That the Hospital has made every reasonable effort to settle the dispute (29 U.S.C. § 108).
 
 
 18
 Because the Union challenges the district court's conclusions with regard to all of these elements, we will address each element in turn.[3]
 
 1. Fraud and Unlawful Acts
 
 19
 In addition to satisfying the strict requirements of the NLA, the Hospital must demonstrate "a fair chance of success on the merits." On the merits of what? Of one of the Hospital's substantive claims. The Hospital's complaint contained six damages claims: libel, trade libel, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, interference with contractual rights, and secondary boycott under section 303 of the Labor Management Relations Act ("LMRA") (29 U.S.C. § 187). Four of the six claims cannot form the basis for injunctive relief. The interference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA. Local 20, Teamsters v. Morton, 377 U.S. 252, 260-61, 84 S.Ct. 1253, 1258-59, 12 L.Ed.2d 280 (1964). And an employer cannot seek injunctive relief from a secondary boycott under section 303; only damages are available. Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 448, 107 S.Ct. 1841, 1852-53, 95 L.Ed.2d 381 (1987) (because the NLRB has exclusive authority to seek injunctions under the National Labor Relations Act, "employers are not permitted to obtain injunctions of secondary activity."); California Ass'n of Employers v. Building and Constr. Trades Council of Reno, 178 F.2d 175, 178 (9th Cir.1949) ("The [LMRA] did not give private litigants the right to obtain injunctive relief even in those situations where a suit for damages was allowed."). That leaves the Hospital's defamation claims as the only possible basis for the preliminary injunction.
 
 
 20
 Because the injunction must be predicated on the Hospital's defamation claims, the Supreme Court's decisions in Linn v. United Plant Guard Workers of Am., 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), and Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 283, 94 S.Ct. 2770, 2780-81, 41 L.Ed.2d 745 (1974), come into play. These cases stand for the general proposition that "libel actions under state law [are] pre-empted by the federal labor laws to the extent that the State [seeks] to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth." Letter Carriers, 418 U.S. at 273, 94 S.Ct. at 2775. We thus must decide whether the Hospital satisfactorily demonstrated a reasonable chance of meeting this standard at trial, commonly known as the New York Times "actual malice" standard. See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We hold that it did.
 
 
 21
 The Union disputes the district court's finding that the language contained on the banner is fraudulent. The Union argues that the term "rat" has deep historical meaning in the context of labor disputes and should not be subject to injunction. The Union contends that it was merely publicizing the facts of its labor dispute and its opinion that Best Interiors was a "rat contractor" for failing to pay its workers the prevailing wage. The district court concluded, however, that the manner in which the term "rat" was used on the banner was deceptive and misled "all persons exposed" to the banner "into believing that the banner is stating that plaintiff Hospital has a rodent problem."
 
 
 22
 The Union is correct that the NLA allows unions a great deal of latitude in their choice of language in the context of a labor dispute. The Supreme Court has noted that "labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language." Linn, 383 U.S. at 58, 86 S.Ct. at 661 (citation omitted). The Court has also noted that "federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." Letter Carriers, 418 U.S. at 283, 94 S.Ct. at 2781. The license to use inflammatory rhetoric during a labor dispute, however, is not unbridled under the NLA. Where, as here, a union's fraudulent language is directed at an entity with which no labor dispute exists, the NLA does not prevent a district court from exercising jurisdiction to issue an injunction prohibiting the fraudulent activity. See Donnelly, 154 F.2d at 45 ("[N]othing in the Norris-LaGuardia Act denies to the Federal courts the power to issue an injunction in an action growing out of a labor dispute where the evidence clearly establishes the requisite jurisdictional findings. Fraud and violence are as unlawful and as reprehensible in a labor controversy as elsewhere.").
 
 
 23
 The most natural reading of the Union's statement "THIS MEDICAL FACILITY IS FULL OF RATS" is that the Hospital has a rodent problem. This, the Union concedes, is not true, nor has the Union ever believed it to be true. The Union argues, however, that the term "rat" has deep historical meaning in the context of labor disputes. Most dictionaries, the Union points out, define "rat" not only as a type of rodent, but also as an employer who fails to pay prevailing wages or a worker who works for substandard wages. Because Best Interiors was not paying its workers prevailing wages, the Union argues that its statement was both "literally and factually" true-the Hospital was "full of rats."
 
 
 24
 The Union relies heavily on the Supreme Court's conclusion in Letter Carriers regarding a union's use of the word "scab." There, the Court explained:
 
 
 25
 It should be clear that the newsletter's use of the epithet "scab" was protected under federal law and cannot be the basis of a state libel judgment. Rather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true. One of the generally accepted definitions of "scab" is "one who refuses to join a union," Webster's Third New International Dictionary (unabridged ed.1961), and it is undisputed that the appellees had in fact refused to join the Branch.
 
 
 26
 Letter Carriers, 418 U.S. at 282-83, 94 S.Ct. at 2780. But the distinction between the union's use of the word "scab" in Letter Carriers and the Union's use of the phrase "THIS MEDICAL FACILITY IS FULL OF RATS" in this case is patent. Nobody would have understood the union in Letter Carriers to be referring to the non-union workers as "crust[s] of hardened blood and serum over a wound," or "scabies of domestic animals." See Webster's New Collegiate Dictionary 1021 (defining "scab"). By contrast, the manner in which the Union used the term "rat" on its banner could cause most-if not all-readers to be misled into believing that the banner meant that the Hospital had a rodent problem. This is not true.
 
 
 27
 The same distinction can be drawn with regard to the other cases cited by the Union. In Beverly Hills Foodland, Inc. v. United Food & Commercial Worker's Union, 840 F.Supp. 697, 705 (E.D.Mo.1993), aff'd, 39 F.3d 191 (8th Cir.1994), the court ruled that a union handbill entitled "Don't Help Feed the Rat" identifying Foodland as a "rat employer" was protected by federal labor law because the handbill's use of the word "rat" could not be construed as a misrepresentation of fact. "No one could read the handbill," the court explained, "and believe that the owner/manager of Foodland was actually a rodent animal." Id. at 705.
 
 
 28
 Likewise, in BE&K Constr. Co. v. NLRB, 23 F.3d 1459 (8th Cir.1994), cert. denied, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995), the court noted that it was not improper for a trade union publication to urge "solidarity" against BE & K and describe the company as a " 'rat' contractor." Id. at 1463. Again, in this context, the use of the term "rat" to describe the management side of the labor dispute was not deceptive or designed to mislead members of the general public. No reasonable reader would have believed, based on the newsletter, that the contractor was actually a four-legged rat. The same cannot be said in this case.
 
 
 29
 The problem with the use of the term "rats" in this case was not the mere use of the term, but the manner in which it was used. The district court found a high probability that members of the public would be and actually were deceived by the Union's use of the phrase "THIS MEDICAL FACILITY IS FULL OF RATS" in the banner. Based on our independent review of the record, we agree. The banner states in prominent lettering "THIS MEDICAL FACILITY IS FULL OF RATS." At no place in that phrase or in the entire banner does the Union identify Best Interiors as the "rat contractor." The term "rats" is directed at the Hospital, not the contractor with whom the Union has the labor dispute. The allegedly explanatory language on the banner is in letters less than half the size of the first statement and is located at the bottom of the banner just above the feet of the individuals holding it. The words "Best Int." identifying the disputed contractor are smaller still, handwritten, and, as a result, difficult to read at best by drivers passing on San Bernardino Road.[4] The cases cited by the Union do not undercut the district court's conclusion that the manner in which that term was used in the chosen context was fraudulent, deceptive, and intended to mislead members of the general public into believing that the Hospital suffered from a sanitation problem.
 
 
 30
 We agree that "[e]xpressions of opinion, though inaccurate and even misrepresentative in character, obviously cannot be permitted to be made the basis ordinarily for injunctive process in a labor dispute." International Ass'n of Bridge, Structural & Ornamental Iron Workers v. Pauly Jail Bldg. Co., 118 F.2d 615, 616 (8th Cir.1941). We also agree that "[a]ccusations of unfairness against an employer normally will fall within this category" of opinion. Id. But in this case, the phrase "THIS MEDICAL FACILITY IS FULL OF RATS" cannot be construed as an opinion. It certainly is designed to grab the reader's attention, but only because it purports to be an expression of fact which, if true, would deter reasonable people from seeking medical care at the Hospital. The NLA was intended
 
 
 31
 to leave the federal courts free to enjoin those permeative acts, falling within the term "fraud or violence," which an unsluggish public conscience and a healthy social order cannot soundly tolerate, even at the risk of thereby enabling one of the parties to tip the scales of the fundamental dispute.
 
 
 32
 Id. at 617. The language on the Union's banner crossed the line separating protected rhetorical hyperbole from unprotected fraudulent misrepresentations of fact. See Mercy Health Servs. v. 1199 Health and Human Serv. Employees Union, 888 F.Supp. 828 (W.D.Mich.1995) (holding television commercials "defamatory because they attempt to frighten Michigan residents into believing that [Mercy's hospitals] cannot deliver adequate care and comfort"). As in Peel v. Attorney Registration and Disciplinary Comm'n of Ill., 496 U.S. 91, 107 n. 14, 110 S.Ct. 2281, 2291 n. 14, 110 L.Ed.2d 83 (1990), the "legal question" in this case "is whether a statement of ... fact is nonetheless so misleading that it falls beyond the First Amendment's protections." The Union's assertion that the Hospital was full of rats is such a statement. On this evidentiary record, the Union's banner is fraudulent, there is a reasonable probability that the Hospital can successfully prove "actual malice," and the NLA did not deprive the district court of jurisdiction to enjoin the banner's display.
 
 
 33
 2. Irreparable Injury and No Adequate Legal Remedy
 
 
 34
 The district court heard evidence from several of the Hospital's employees that they spent a portion of their time explaining to patients and other employees that the Hospital was not actually infested with rodents. Though there is no indication that patients and Hospital employees remained confused and misled after they were told that the Hospital was not actually suffering from sanitation problems, the time spent by Hospital employees explaining the nature of the labor dispute and reassuring patients was time taken away from their ordinary administrative and medical care duties.
 
 
 35
 The Hospital also introduced evidence that its reputation and, consequently, its fund-raising ability had been impaired since the Union began displaying the fraudulent banner. Potential contributors were less likely to donate funds to the Hospital if they believed the facility was actually infested with vermin and maintained unsanitary conditions. As another court recently noted: "The reputation of a hospital is difficult to restore once it has been tainted." Mercy Health Servs., 888 F.Supp. at 838. We agree.
 
 
 36
 Finally, it is impossible to measure the number of potential patients who were deterred from seeking medical care at the Hospital due to their misunderstanding of the Union's banner because they are not available to be counted. Because the banner was located directly in front of the entrance to the Hospital's maternity ward, however, evidence from employees who worked in that area provided one reasonable measurement of the deterrence caused by the Union's conduct, demonstrating a statistically significant drop in maternity patients. Cathy Knittle, an Assistant Director of Business Services at the Hospital and the person in charge of the department responsible for admissions to the Hospital, testified that maternity preadmissions, a method of early registration for expectant mothers, had dropped by 200 patients per month since the Union began displaying the banner. This drop in maternity preadmissions is not insignificant.[5] The district court concluded that the Hospital suffered irreparable injury as a result of the Union's fraudulent activity and had no adequate legal remedy to redress the harm caused. Based on our review of the record, we agree.
 
 3. Balancing the Hardships
 
 37
 The Hospital provided substantial evidence regarding the injury it sustained as a result of the Union's fraudulent conduct. The burden to the Union of clarifying its banner, however, is slight in light of the narrowness of the district court's injunction. Shortly after the district court issued its injunction in this case, the Union began displaying a second banner with twelve-inch red capital lettering alongside the first banner which reads: "BEST INTERIORS IS THE RAT CONTRACTOR." The Hospital filed an ex parte application to the district court, asking for a contempt citation, but the district court ruled that the injunction had not been violated because the Union had clarified the misleading nature of the term "rats." Due to the narrow scope of the district court's injunction and the ease with which the Union complied with its requirements, the Union has been burdened only slightly at best as a result of the issuance of the injunction.
 
 4. Local Police
 
 38
 The Hospital introduced evidence that administrators at the Hospital had contacted the local police department and were told that the police were unable to do anything about the banner. The Union contends that this testimony was hearsay and therefore inadmissible. The district court did not sustain the Union's objection, however, which was not raised until the end of the witness's direct examination. Therefore, the evidence was properly admitted and the untimely objection was waived.[6]
 
 5. Efforts to Settle the Dispute
 
 39
 The Union argues in a footnote near the end of its opening brief that the Hospital introduced insufficient evidence "to establish that it engaged in all reasonable efforts to settle the matter before seeking injunctive relief." At the evidentiary hearing, however, the Hospital introduced evidence that it had engaged the Union on a number of occasions in an effort to resolve this dispute before seeking an injunction. There is sufficient evidence in the record to support the district court's conclusion that the Hospital satisfied this element.
 
 
 40
 We emphasize the narrowness of our decision. The Union displayed a banner in front of the Hospital that included a prominent declaratory statement of fact which was so misleading as to be fraudulent. The NLA generally prohibits federal courts from issuing injunctions in labor disputes, but when a union engages in fraudulent activity, the Act does not deprive a court of the power to enjoin it. The district court in this case carefully crafted a narrow injunction that prohibited the fraudulent manner in which the Union used the term "rats," but did not prohibit the use of the term itself. The Hospital presented evidence to the district court that has convinced us that the strict requirements of the NLA are satisfied. As a result, the district court did not err in issuing a narrowly tailored preliminary injunction to prevent the Union from using the term "rats" in a fraudulent manner.
 
 B. Prior Restraint
 
 41
 The Union argues that the district court's preliminary injunction amounts to an unconstitutional prior restraint on speech. This issue, however, is rendered moot by our resolution of the district court's jurisdiction under the NLA. We concluded above that the district court correctly found that the Union's display of the banner was fraudulent. The First Amendment does not protect fraud. See Peel v. Attorney Registration and Disciplinary Comm'n of Ill., 496 U.S. 91, 107 n. 14, 110 S.Ct. 2281, 2291 n. 14, 110 L.Ed.2d 83 (1990); Gehl Group v. Koby, 63 F.3d 1528, 1534 (10th Cir.1995). As the California Supreme Court has noted: "The policy of this state which characterizes the use of false or fraudulent statements in picketing as unlawful is within the permissible limits which a state may impose upon industrial combatants without impairing the right of free speech." Magill Bros., Inc. v. Building Serv. Employees' Int'l Union, 20 Cal.2d 506, 127 P.2d 542, 545 (1942) (citing Thornhill v. Alabama, 310 U.S. 88, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093 (1940)). We agree.
 
 III. CONCLUSION
 
 42
 After considering the entire evidentiary record and all of the Union's arguments on appeal, we conclude that the district court did not abuse its discretion in issuing its narrowly tailored preliminary injunction prohibiting the Union's fraudulent activity because the Hospital satisfied the strict requirements of the Norris-LaGuardia Act. We therefore AFFIRM.
 
 
 43
 AFFIRMED.
 
 
 44
 KOZINSKI, Circuit Judge, dissenting.
 
 
 45
 Those who would enjoin speech concerning a matter of public interest must bear a heavy burden, see Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577-78, 29 L.Ed.2d 1 (1971) ("heavy presumption" of unconstitutionality), more so if the speech in question concerns a labor dispute. See Norris-LaGuardia Act, 29 U.S.C. § 104(e) (prohibiting injunctions of labor speech unless "involving fraud or violence"); Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 369, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960) ("[The NLA's] language is broad because Congress was intent upon taking the federal courts out of the labor injunction business....").[1] The Hospital here did not carry its burden of showing it will suffer a "substantial and irreparable injury." See 29 U.S.C. § 107(b). It's implausible to believe that anyone choosing what hospital to patronize, or whether to donate money, would make such a weighty decision on the basis of a fleeting glance at a picket sign during a drive-by. People ain't that dumb; they would investigate and discover the truth.[2] There is no proof that a single person was deterred by the sign from using the hospital or donating money-not a one. The evidence about the decline in maternity ward admissions is not sufficient, as there was no connection-temporal or otherwise-to the union's picketing; the decline started in April, but the sign didn't go up until late June.[3] Either there were a lot of clairvoyant (but gullible) expectant mothers in Upland, California, or the decline had nothing to do with the union's banner.
 
 
 46
 This may not seem like a big deal. Who, after all, can object to forcing the union to change its banner so as to avoid even a small risk of deceiving the public? But ambiguity and flamboyance are often at the heart of political expression. Who, for example, can forget "Where's the Beef" from the 1984 Presidential campaign? But what if Senator Mondale had been forced to say: "Where's the substance?" No one would have noticed or remembered.
 
 
 47
 So too with rats. Changing the sign may make it clearer, may avoid the smallest risk of confusion, but it saps the message of its vigor. See Old Dominion Branch No. 496, Nat'l Assn. of Letter Carriers v. Austin, 418 U.S. 264, 284-86, 94 S.Ct. 2770, 2781-82, 41 L.Ed.2d 745 (1974) (use of the word "traitor" in a definition of a union "scab" not the basis for a defamation action since used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members"). I don't believe courts are equipped-or even permitted-to evaluate such trade-offs. Because the sign here was literally true, within an accepted meaning of the word used, I would quash the injunction and let the parties work out their differences in the marketplace-and in the marketplace of ideas.
 
 
 48
 * * *
 
 
 49
 The majority now explains that the wrong the preliminary injunction was designed to prevent is a defamation covered by New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). From bad to worse: Not only is this the first case to affirm a labor injunction, it is the first ever (so far as I am aware) to uphold a preliminary injunction against speech covered by Sullivan.[4] Because Sullivan speech always involves matters of public interest, I had assumed that damages after trial on the merits is the high water mark of available relief. An interlocutory injunction based on a "reasonable probability" of malice, maj. op. at 1237, is, by hypothesis, not based on "actual malice." See 376 U.S. at 279-80, 84 S.Ct. at 725-26. Since labor speech enjoys even greater protection than ordinary speech, today's opinion will provide plausible support to those who seek prior restraints against allegedly defamatory newspaper and magazine articles, as well as television programs, plays and movies. Indeed, given the wafer-thin defamation claim here, and the paltry evidence of irreparable harm, getting a preliminary injunction against speech offensive to public officials and other VIPs may not be all that hard.
 
 
 
 [1]
 At about the time the Union began displaying the banner, the banner's holders also began distributing a handbill to interested pedestrians which explained that "[a] rat is a contractor that does not pay all of its employees prevailing wages or provide health and pension benefits to all of its employees."
 
 
 [2]
 This element duplicates the irreparable injury requirement under the traditional analysis
 
 
 [3]
 In its order granting the Hospital's motion for a preliminary injunction, the district court did not explicitly address the traditional "fair chance of success on the merits" element, but did note that it had "considered the pleadings and other documents filed herein" in making its ruling. Though the Union offered only a cursory analysis of this element in its opposition to the Hospital's motion, it did state that "HOSPITAL has not shown that it has a substantial chance of success on the merits of its common law claims." (See Union's Memorandum of Opposition filed July 18, 1996, at pg. 15.) The Union's argument on this point is even less clear on appeal, and is formulated as an argument that the Hospital's state law claims are "preempted" because the banner is "literally and factually true." (Blue 25-27.) Though the question is close, we conclude that the Union has not waived its objection to the traditional "fair chance of success" requirement for a preliminary injunction, and we will therefore decide the issue
 
 
 [4]
 The size of the lettering used by the Union is a factor in the determination of whether or not the Union's message was deceptive. In NLRB v. San Francisco Typographical Union No. 21, 465 F.2d 53 (9th Cir.1972), the union picketed a neutral party with the object of persuading consumers not to purchase a certain "struck product." The NLRB determined that "the picket signs did not adequately identify the struck products, because such advertisements were too difficult for shoppers to read," and we held that "the union must accept the burden of properly identifying the [target of the strike]." Id. at 56
 
 
 [5]
 The dissent faults our reliance on Ms. Knittle's testimony, calling it "not sufficient" evidence of substantial and irreparable injury. See dissenting op., at 1239-40. Had this been the only evidence of injury the Hospital presented to the district court, we might agree. However, the dissent overlooks the additional evidence presented by several Hospital employees regarding lost administrative time and damage to the Hospital's reputation and fund-raising ability. Taken together, this is sufficient evidence of substantial and irreparable injury
 
 
 [6]
 The Union also argues, for the first time on appeal, that the Hospital did not give the police department advance notice of the preliminary injunction hearing, as it is required to do by 29 U.S.C. § 107(e). This is incorrect. The Hospital served notice of the hearing to Chief Martin Thouvenell via Federal Express at least seven days before the hearing
 
 
 [1]
 The banner here was used in prosecuting a labor dispute, and "rats" is a term of art which conveys a specific, nondefamatory meaning in that context. See maj. op. at 1235. In addition to rodents and police informants, the term refers both to contractors who pay less than the prevailing wage and to workers who accept such a wage. See 2 The Compact Edition of the Oxford English Dictionary 2418 (1st ed., 24 prtg.1985); Webster's Third New International Dictionary 1884 (1981)
 
 
 [2]
 The truth here would have been easy to find as the union was passing out flyers explaining that "[a] rat is a contractor that does not pay all of its employees prevailing wages or provide health and pension benefits to all of its employees." As well, prospective patients or donors could have asked-and in fact did ask-hospital personnel for clarification
 
 
 [3]
 The decline was calculated based on a comparison between 1600 admissions in March 1996 and 1400 at the time of evidentiary hearing on August 9, 1996. The banner first went up on June 21, 1996-almost three months after the benchmark date
 The entire record on the decline is the following testimony by the Hospital's Assistant Director of Business Services:
 DIRECT EXAMINATION
 Q. Since the banner has been up, have you noticed a decline of the number of preadmits to the Maternity Department?
 A. Yes.
 ....
 I received daily reports, and we are approximately 200 maternity patients.
 Q. Downwards?
 A. Yes.
 CROSS-EXAMINATION
 Q. And you say that statistically your report shows that the number of maternity patients has declined 200 over what, the month before or what, over what standard?
 A. Statistically up until about March we had 1600 preadmits per month. We are down to 1400.
 E.R. tab 11, at 77-79.
 
 
 [4]
 I know of only one other published opinion where such an injunction has even been issued, Mercy Health Services v. 1199 Health & Human Service Employees Union, 888 F.Supp. 828 (1995). This case involved, perhaps not coincidentally, a labor dispute at a hospital