**METROPOLITAN OPERA
ASSOCIATION, INC.,
Plaintiff–Appellee,**

v.

**LOCAL 100, HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION, Henry Tamarin, individually and in his capacity as President of Local 100, Hotel Employees and Restaurant Employees International Union and Dennis Diaz, individually and in his capacity as Organizer of Local 100, Hotel Employees and Restaurant Employees International Union, Defendants–Appellants.**

Docket No. 00–7763.

United States Court of Appeals,
Second Circuit.

Argued: Sept. 15, 2000.

Decided: Feb. 2, 2001.

ling, Philadelphia, PA, and Sharon E. Grubin, General Counsel, Metropolitan Opera, New York, NY, on the brief) for Plaintiff–Appellee.

Michael Anderson, Davis, Cowell & Bowe, San Francisco, California (Joseph J. Lynett, Herrick, Feinstein, New York, NY, on the brief) for Defendants–Appellants.

Arthur Eisenberg, Christopher Dunn, New York, NY, on the brief, for amicus curiae New York Civil Liberties Union Foundation.

Jamin B. Raskin, Professor of Law, Washington College of Law, American University, Washington, D.C., Hillary Richard, Laurie Edelstein Brune & Richard, New York, NY, on the brief, for amici curiae Global Exchange, United Students Against Sweatshops and Harvard Progressive Student Labor Movement.

Before WALKER, Chief Judge, LEVAL and PARKER, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

In this appeal, appellant Hotel Employees and Restaurant Employees Local 100 ("the Union" or "Local 100") challenges an injunction entered by the district court prohibiting the Union from publicly implicating the Metropolitan Opera ("the Met") in a labor dispute that the Met claimed involved only the Union and the Met's food service provider, RAPERA, Inc. ("Restaurant Associates" or "RA"). RA provides food service and concessions during Met performances and intermissions, and is the direct employer of the workers the Union seeks to organize.

The Met commenced this action in New York State Supreme Court, and on May 4, 2000 obtained a temporary restraining order ("TRO") against the Union's activities. Shortly thereafter, the Union removed the case to the United States District Court for the Southern District of New York and moved to dissolve the TRO. On June 9, 2000, after a hearing, the district court (Loretta A. Preska, *District Judge*) denied

Deborah E. Lans, Morrison Cohen Singer & Weinstein, New York, NY, (Vincent J. Pentima, Klett Rooney Lieber & Schor-

the motion to dissolve the TRO, and continued it as a preliminary injunction. *See Metropolitan Opera Ass'n, Inc. v. Local 100*, 2000 WL 872829 (S.D.N.Y. June 1, 2000). The injunction prohibits the Union and its members generally from "threatening or harassing" and "engaging in fraudulent or defamatory representations regarding" the Met, its donors, officers, patrons, or directors. The district court also granted the Met's motion to hold defendants in contempt of the TRO for various acts that took place after May 4, and ordered the Union to pay the Met $10,000 in fines to compensate it for "its damaged reputation and good will." The Union now appeals from the order granting the preliminary injunction.

In seeking to vacate the injunction, the Union makes three primary arguments: (1) the district court erred in holding that the only "labor dispute" that would trigger the Norris LaGuardia Act's (NLA) anti-injunction provision was between the Union and RA, and not between the Union and the Met, *see* 29 U.S.C. §§ 104, 113; (2) the district court erred in concluding that, even if the NLA applied, it had jurisdiction to issue the injunction under the NLA's "unlawful acts" exception because the Union's activities were defamatory, *see* 29 U.S.C. § 107; and (3) the injunction contravenes the First Amendment and traditional libel law as a prior restraint against defamatory speech, and is impermissibly vague because it makes "no attempts to draw a boundary line between permissible free speech and a contempt of court." Appellants' Brief at 55.

▌ While we agree that the injunction presents serious questions under the First Amendment and libel law, we hold that the injunction is impermissibly vague because it fails to provide the Union with adequate notice of what conduct is being enjoined. We do not reach the merits of the Union's other arguments. Whether the Norris–LaGuardia Act poses a "jurisdictional" bar to the injunction need not be addressed as a threshold question. Unlike questions that affect the court's constitutional power to act under Article III, which should be resolved before proceeding to the merits, *see Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the NLA issue involves a statutorily defined claim that stands in pari materia with the claims we address here.

## BACKGROUND

### A. The Dispute

RA operates under a multi-year, exclusive contract with the Met to provide concessions in connection with performances. This contract will expire, unless renewed, on July 31, 2001. In January, 1999, the Union began an organizing drive among employees of RA who work the concessions at the Met. RA resisted and the National Labor Relations Board ("NLRB") took enforcement action against RA based upon evidence that RA surveilled and interrogated employees and threatened to delay any proposed representation election. On April 10, 2000, RA and the NLRB General Counsel settled that case.

Beginning in 1999, in part because of continued RA intransigence, the Union solicited the Met's help in influencing RA to "abandon its anti-union campaign and accept a neutrality/card-check process." A card-check process permits a Union seeking to organize workers to bypass the traditional NLRB election process, and instead to collect cards from individual workers voting in favor of unionization. When a majority of the workers has checked its cards, the Union can represent the workers. During this process the employer promises to remain neutral by not hiring "union busters" or speaking against the Union.

The Met sought to avoid involvement in what it claimed was purely a dispute between RA and the Union. Unable to gain the Met's support, the Union initiated a campaign of public criticism directed at the Met, and its directors, donors, and patrons

for their alleged support of "unfair labor practices" and failure to help resolve the dispute in the Union's favor. The Union's activities included chanting and distributing pamphlets in front of the Met, sending letters to Met directors and donors, and asking donors to discontinue their contributions. At rallies before Met performances, union demonstrators chanted slogans like "shame on you" or "no more lies, give us the right to organize." Pamphlets distributed to Met patrons contained such statements as "Met Opera out of tune with food service workers' rights," "we are the only Met Opera workers without a union," and "find out what they are doing at the Met to the people who will be serving your meal." Typical letters stated that the Met or one of its Directors is "at the center of a troubling labor dispute," or is "engaged in a bitter, high profile labor dispute," or that the donor, by contributing to the Met, is "supporting unfair labor practices." In one letter to an executive of the Boy Scouts of America, the Union stated that Paul M. Montrone, the President of the Met and a member of a committee of the Boy Scouts of America, was

> at the center of a troubling labor dispute. Mr. Montrone has so far refused to meet with the workers.... The bartenders, buspersons, cashiers, cooks, dishwashers and waiters at the Met are fighting for their rights.... As the President of the Metropolitan Opera, Mr. Montrone is in a position to help resolve this labor dispute quickly and fairly.

While some of these letters mentioned RA by name, many referred to RA only as the Met's food service provider.

One leaflet criticized Scully & Scully, a small donor to the Metropolitan Opera Guild's annual auction, in the following language: "Scully & Scully: Supporting unfair labor practices and union busting tactics.... Scully & Scully is in a position to help end such abuse of hard working New Yorkers. Tell Scully & Scully not to contribute to the Met Opera Guild's auction

this year." The Union distributed other leaflets during multiple visits to Forest Laboratories, whose Chairman and CEO is a Managing Director at the Met. One leaflet asked, "Have you experienced or witnessed any of these at Forest Laboratories?" followed by a list of violations and ethical lapses, including, among other things: price fixing or collusion; corruption; bribery; FDA problems; harassment; physical abuse; and unwelcome sexual conduct.

### B. The District Court Decision

In deciding to continue the state court TRO as a preliminary injunction, the district court held that the controversy between the Union and the Met was not a "labor dispute" under the Norris–LaGuardia Act (NLA), 29 U.S.C. § 101 *et seq.*, and therefore, the NLA's anti-injunction provisions did not apply. The district court held in the alternative that even if the conflict were a "labor dispute," the Norris–LaGuardia Act's "unlawful acts" exception permitted the injunction. *See* 29 U.S.C. § 107. Finding no barrier to an injunction under the NLA, the district court concluded that a preliminary injunction was necessary to prohibit the Union from defaming, harassing or threatening the Met, and that such an injunction would not violate the First Amendment, because it aimed "to redress a private wrong and not to suppress public opinion." Finally, the district court held the Union in civil contempt of the TRO, based upon multiple leaflets, letters, and actions taken by the Union subsequent to the May 4 TRO that the district court found defamatory or harassing.

### DISCUSSION

■ The Union argues that we should vacate this injunction because it constitutes an impermissible prior restraint under the First Amendment and traditional libel law, and because it is impermissibly vague in failing to distinguish permissible from prohibited speech. We agree that the injunction presents serious questions

under the First Amendment and libel law, but find it unnecessary to ultimately determine these issues because we hold that the injunction must be vacated as its scope and meaning are unclear.

■ When considering the validity of this injunction under the First Amendment, we have "an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 284–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

The preliminary injunction here plainly constitutes a broad prior restraint on speech. It prohibits the Union from:

engaging in fraudulent or defamatory representations regarding the MET and/or its donors, directors, officers and/or patrons; and ...

threatening or harassing the MET and/or its donors, patrons, directors or officers; and ...

blocking or otherwise obstructing or interfering in any manner with ingress to or egress from the Met....

■ A "prior restraint on expression comes ... with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968)); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Indeed, prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

■ When a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("Injunctions ... carry greater risks of censorship and discriminatory application than do general ordinances."). An injunction must be obeyed until modified or dissolved, and its unconstitutionality is no defense to disobedience. *See Walker v. Birmingham*, 388 U.S. 307, 314–21, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, [a] prior restraint 'freezes' it, at least for the time." *Nebraska Press Ass'n*, 427 U.S. at 559, 96 S.Ct. 2791. In contrast, a "criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative." *Nebraska Press Ass'n*, 427 U.S. at 559, 96 S.Ct. 2791.

Here, the preliminary injunction broadly prohibits the Union from making any statement that might, after it has been made, be construed as defamatory or even "harassing." For example, the district court here imposed contempt sanctions on the Union when it found statements that were made after the initial May 4 state TRO to be defamatory, including the chants "No More Lies" and "Shame On You." This finding, improper in our view, demonstrates that the Union risks contempt sanctions for speech that may ultimately, after full appellate review, be found constitutionally protected. The risk of contempt sanctions may thus "freeze" the Union's attempts to exert what it perceives as legitimate social pressure on the Met, rather than simply "chill" the Union's speech, as might result from the threat of a subsequent damage award. *See Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir.1963) (nullifying an injunction against publication of "any" statements about a

person as a broad prior restraint void under the First Amendment).

■ In addition to the First Amendment's heavy presumption against prior restraints, courts have long held that equity will not enjoin a libel. *See Nebraska Press Ass'n,* 427 U.S. at 559, 96 S.Ct. 2791; *American Malting Co. v. Keitel,* 209 F. 351, 354 (2d Cir.1913); *Kramer v. Thompson,* 947 F.2d 666, 677–78 (3d Cir.1991) (citing cases); *Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 672 (D.C.Cir.1987) ("The usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.") (internal citation omitted). Indeed, for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases. *See American Malting Co.,* 209 F. at 354 ("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States ....") (citation omitted); *Crosby,* 312 F.2d at 485 (reaffirming the common law rule of *American Malting*). The holding in *American Malting* rests in large part on the principle that injunctions are limited to rights that are without an adequate remedy at law, and because ordinarily libels may be remedied by damages, equity will not enjoin a libel absent extraordinary circumstances. No such extraordinary circumstances are present here, even if we were to adopt the district court's preliminary finding that the leaflets and letters were false, as readers of the leaflets "may be deceived by false statements, but they are left free to form their own judgment and make their own choice" about the Met's involvement in the labor dispute. *Cf. American Malting,* 209 F. at 356.

While the *American Malting* court included among the "extraordinary circumstances" such factors as intimidation and coercion, *see id.* at 357, current First Amendment principles may prohibit granting an injunction even when such factors are present. The Supreme Court has expressly afforded a special breadth of protection to union speech that publicizes labor conflicts. For example, the Court has taken considerable pains to limit the scope of state defamation actions in the labor context to those in which "the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn v. United Plant Guard Workers,* 383 U.S. 53, 65, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *id.* (holding that to be libelous, speech in the labor context must satisfy the actual malice and falsity requirements of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686). In so holding, the Court recognized that intense, provocative speech is a common hallmark of American labor conflicts:

> Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable per se in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language.

*Linn,* 383 U.S. at 58, 86 S.Ct. 657 (internal citation omitted). *See also National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

■ Thus, we do not ascribe any particular significance to the district court's finding that the Union was motivated to coerce the Met through social pressure and the threat of social ostracism. The district court found the Union's actions to be "harassing" and "threatening" when the Union warned of "repercussions" against those who did not join its boycott. Such "repercussions" included, for example, fol-

low-up leafletting condemning Scully & Scully for refusing to join. Especially within the labor context, in seeking to exert social pressure on the Met, the Union's methods may be harassing, upsetting, or coercive, but unless we are to depart from settled First Amendment principles, they are constitutionally protected. *See e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909–11, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (holding that a boycott of white-owned businesses, including the use of "store watchers" wearing black hats who published names of those who entered boycotted businesses, and called them "traitors," was entitled to First Amendment protection); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971).

In arguing that these principles of First Amendment and libel law do not prohibit the injunction here, the Met relies on the Sixth Circuit's decision in *Lothschuetz v. Carpenter,* 898 F.2d 1200 (6th Cir.1990). We reject this argument for two reasons. First, the law as interpreted by the *Lothschuetz* court has never been adopted by this Circuit. *See American Malting Co.,* 209 F. at 354. In *Lothschuetz,* the court issued a permanent injunction against the repetition of specifically identified prior statements that had been finally determined to libelous. The court expressly distinguished such an injunction from an injunction aimed at statements not yet found to be libelous. *See Lothschuetz,* 898 F.2d at 1209 (Wellford, *J.,* for the court in part, dissenting in part). We have never held in this Circuit that a libel becomes subject to an injunction once its libelous character has been adjudicated. Second, we do not confront this issue here, because even if the *Lothschuetz* rule were authoritative, it would not protect this preliminary injunction, as it (1) is not confined to specific statements but broadly covers any statement that might be hereafter found to be "threatening," "harassing," "fraudulent," or "defamatory"; and (2) is directed against statements that have not been finally adjudicated to be libelous.

Nor are we persuaded by the Met's reliance upon the Ninth Circuit's decision in *San Antonio Community Hospital v. Southern California District Council of Carpenters,* 125 F.3d 1230 (9th Cir.1997), *reh'g and suggestion for rehearing en banc denied,* 137 F.3d 1090 (9th Cir.1998). Once again, there are two reasons. First, the Ninth Circuit's decision in *San Antonio Community Hospital* is not authoritative in this Circuit. Second, even if it were, it would not justify the injunction granted here. In *San Antonio Community Hospital,* the Ninth Circuit, in a labor and picketing dispute at a hospital, upheld the district court's order enjoining the use of the word "rats" in a manner suggesting that the hospital was infested with vermin. *See id.* at 1236–37. The preliminary injunction thus not only targeted the use of a single specific word, but was limited to a specific use of that word. *See id.* at 1238 (noting that no contempt was found where the union used the word "rat" in a manner that was not misleading).

Here, in contrast, the injunction is vague as to what the Union may say and what statements might lead to a finding of contempt of court. It puts the Union at risk of punishment for good faith efforts to advocate publicly its position that the Met bears some responsibility to help resolve this labor conflict by exerting economic pressure on the contractor operating its restaurants. The reality of such risk is brought home by the fact that the district court found the Union in contempt for chanting "Shame on You" and "No More Lies." The Union has no way of determining from the text of the injunction whether other chants or statements in the future will lead to further contempt sanctions.

■ In the end, the vagueness of this injunction serves as sufficient reason to require that we vacate it. As we have noted above, the First Amendment strongly disfavors injunctions that impose a prior restraint on speech. We note as well that a time-honored principle of libel law is that

equity will not enjoin a libel. However, we are not required at this time to determine whether a more specifically worded injunction under these circumstances would fail to survive under the First Amendment as a prior restraint or under traditional libel law. For present purposes it is sufficient that the terms of the injunction are so vague and imprecise that the Union cannot fairly determine what future speech is permitted and what speech might place it in contempt.

## CONCLUSION

For the foregoing reasons, the opinion of the district court is **VACATED**.